1
2
3
4           UNITED STATES DISTRICT COURT
5           NORTHERN DISTRICT OF CALIFORNIA
6
7   DONALD RAY LILLEY,                          Case No.  4:17-cv-04381-KAW
8               Plaintiff,
                                                **ORDER DENYING PLAINTIFF'S**
9        v.                                     **MOTION FOR SUMMARY**
                                                **JUDGMENT; GRANTING**
10  NANCY A. BERRYHILL,                         **DEFENDANT'S CROSS-MOTION FOR**
                                                **SUMMARY JUDGMENT**
11              Defendant.
                                                Re: Dkt. Nos. 17, 19
12
13          Plaintiff Donald Ray Lilley ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. §

14  405(g), of the Commissioner's final decision, and the remand of this case for benefits or further

15  proceedings.

16          Pending before the Court is Plaintiff's motion for summary judgment (Dkt. No. 17) and

17  Defendant's cross-motion for summary judgment (Dkt. No. 19).  Having considered the papers

18  filed by the parties, and for the reasons set forth below, the Court DENIES Plaintiff's motion for

19  summary judgment, and GRANTS Defendant's cross-motion for summary judgment.

20                          **I.      BACKGROUND**

21          On August 29, 2012, Plaintiff applied for Title XVI Supplemental Security Income,

22  alleging a disability that began on April 8, 2006.  (Administrative Record ("AR") 18, 46, 65.)

23  Plaintiff alleged "various mental [health] and physical impairments" (AR 46, 129) and was given a

24  primary priority impairment diagnosis of "anxiety disorders" (AR 45, 58, 59), with a secondary

25  priority impairment diagnosis of "affective disorders" (AR 45, 58, 59), a later secondary diagnosis

26  of "disorders of back (discogenic & degenerative)" (AR 65) and other priority impairment

27  diagnoses of "spine disorders" (AR 58) and "asthma" (AR 58).  The Social Security

28  Administration ("SSA") denied Plaintiff's application initially on August 30, 2013.  (AR 45, 67-

71.) On October 28, 2013, Plaintiff then filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (AR 73.) The SSA, however, processed this as a request for reconsideration. (AR 74.) The SSA denied Plaintiff's application upon reconsideration on March 14, 2014. (AR 75-19.) On April 17, 2014, Plaintiff filed another written request for a hearing before an ALJ. (AR 81.) The assigned ALJ, Richard P. Laverdure, held a hearing on January 20, 2016, at which Plaintiff, Medical Expert ("ME") Dr. Ann Monis and Vocational Expert ("VE") Lynda Berkley testified. (AR 18, 433.) The Plaintiff was represented by Attorney Suzanne Zalev at the hearing. (AR 18, 433.)

During the hearing, the ALJ noted that there were two prior adverse ALJ decisions, the most recent one dated May 18, 2012 and the other one an abandonment dismissal dated sometime in 2010. (AR 433-34, 437.) Plaintiff also testified at the hearing that the last job he had was working as a van driver for Marriott in 2008 or 2009, where he was paid weekly. (AR 435.) In 2006, he worked for: the Saunders Hotel, Swift Transportation, Toms Company and Tomdra Incorporated, but for Tomdra, he "tried to train for about a week" and "couldn't do that one." (AR 436-37.) Plaintiff also testified that he attended college for three years, studying anthropology and then creative writing, but did not complete a degree program. (AR 437.)

Also at the hearing, ME Monis identified Exhibit 18F (AR 407-13) noting the impairments in Plaintiff of post traumatic stress disorder ("PTSD") and major depression, Exhibit C-11F (AR 349-53) indicating a diagnosis of PTSD, Exhibit C-8F (AR 327-34) indicating diagnoses of anxiety disorder, Exhibit C-4F (AR 289-90) indicating diagnoses of amnestic mild cognitive impairment, social phobia, PTSD, major depressive disorder, and general anxiety disorder. (AR 440.) ME Monis also testified that all the aforementioned diagnoses were "single examinations, which is something that concerned [her] in this entire file" because the file appeared to "have contradictory data," and "lacks treatment notes," she "did not receive anything that indicates that the client has been in any kind of ongoing therapy" and she did have "single-visit exams that do span over the course of the last, approximately, four years, but nothing dating back to 2006." (AR 441.) This led ME Monis to conclude that "[a]ll in all, the client [or Plaintiff] did not meet any of the listings, alone or in combination." (*Id.*)

As an example, ME Monis noted for "Exhibit C-8F [AR 327-34], dated 7/29/13, by Dr. Sardy, we have a full scale I.Q. of 122 [for Plaintiff], and a working memory index of 108 with a corresponding GAF score of 53. Yet the year before, nearly exactly a year before, 7/11/12, [Plaintiff] suffers from amnestic cognitive impairment" which "would mean that his memory is not working." (AR 441-42.) Because the above data was "ten standard deviations above the norm," and revealed "mild to moderate symptoms in some of [Plaintiff's] evaluations, yet severe symptoms in others" ME Monis found it "odd" and "contradictory" for memory, because there were "many mental status exams that come out normal" and the data does not show Plaintiff "meeting or exceeding the cut-off criteria on any of his many mental status exams." (AR 442.)

Another issue that ME Monis found with one of the evaluations, specifically for Exhibit C-8F (AR 327-34) again, was that one of the evaluators, Dr. Robert Sardy, PhD, used "a gradient of moderate to severe rather than checking a box that actually corresponds with an answer" and "[u]nfortunately, a gradient doesn't work because it leaves too much ambiguity. Yet [Dr. Sardy] rates [Plaintiff's] GAF [Global Assessment of Functioning][1] of 53, which is moderate. So to err on the side of caution, I had to sort of try to collaborate the record [Dr. Sardy] himself is submitting. I erred on the moderate side." (*Id.*) ME Monis further testified that "[y]ou will continue to see [Plaintiff's]  GAFs that vary between the 45 and 41 range, yet the [evaluations] themselves say there is nothing of note, no issues, and the many mental status exams come up normal. Everything is within normal limits, and then we see a GAF score [that] says [Plaintiff is] 45, and the [Plaintiff] saying that his memory is impaired and he can't remember anything" and "[y]et nothing was in the evaluation indicating that [Plaintiff] wasn't able to answer the questions." (AR 443.)

ME Monis also testified that Exhibit C-19F (AR 414-28), which contains handwritten notes dated 12/11/15 involving a mental impairment questionnaire from Melissa Anderson, a licensed marriage and family therapist at West Berkley Family Practice who Plaintiff saw weekly since 7/21/15, contained "consistent" and "well founded" diagnoses of the Plaintiff's mental health

---

[1] "GAF stands for 'Global Assessment of Functioning.['] The GAF is a scale from 0 to 100 where higher scores indicate greater levels of functioning. Optimal mental health and coping capabilities are represented by scores in the 91 − 100 range. Persons with mild psychological problems fall in the 71 − 90 range." *See* https://www.mentalhelp.net/advice/what-does-gaf-stand-for/

with the rest of the record. (AR 444-45.) ME Monis also remarked that "even this clinician from 7/21/2015 indicates that the GAF score for the past year is in the 60s, which means that we're looking at 20 point improvements from the years before." (AR 445.) ME Monis also indicated that Plaintiff had "fair consistency in attendance since July" and his diagnoses appears to be "fairly consistent once he started attending. The diagnoses [also] do seem to be within range...his GAF score seems to be going up, which is indicative that he's getting better." (*Id.*)

Overall, given the internal inconsistency in records, ME Monis stated that Plaintiff "consistently reports difficulty with social interactions and difficulty with coworkers" and to "err on the side of caution," she rated Plaintiff "mild" in "restriction of daily activities of daily living," "moderate" in "difficulties in maintaining social functioning," "mild" in "difficulties in maintaining concentration, persistence, or pace" and "none" for "repeated episodes of deterioration." (AR 447-48.) Also, when questioned by the ALJ, ME Monis suggested – judging by Plaintiff's report – that a work capacity with limitations on interactions with others, particularly with the public, would be appropriate. (AR 448.)

When questioned by Attorney Zalev on what helped draw conclusions about Plaintiff's conditions other than GAF scores, ME Monis testified that: "I believe the diagnoses are internally consistent. They do repeat themselves. I did explore his test scores. I compared them to other test scores a year later. I evaluated each and every independent evaluation he's received and tried to understand where these scores were derived from and how they've changed over time, hardly focused only on the GAF score. Like I said, he has [a] 122 I.Q., a working memory of 108, and yet a year before, he was diagnosed with amnestic disorder. This would be consistent with the possibility of malingering [or feigning illness]. Someone has an amnestic disorder one year, and then has a 108 score the following year would be something to investigate." (AR 448-49.) In addition, ME Monis described Exhibit C-1F (AR 260-76), which describes a MCMI-III test for malingering performed on Plaintiff by Dr. Katherine Wiebe, Ph.D. (finding that Plaintiff was not malingering) as something that does not "measure the overall assessment of an individual" and which must be taken into account along with "his clinical interview, and all of his other testing" in order to "establish whether your client is malingering." (AR 449-50.)

Nonetheless, ME Monis stated that she had "no doubt that [Plaintiff's] scores on the MCMI-III are indeed valid" but even though "we may be looking at a valid test result," this "doesn't change the entire evidence in the file dating back four or five years indicating varying results of varying credibility and changing scores that may or may not be reliable." (AR 450-51.) ME Monis also affirmed the ALJ's inquiry that there's a question of whether or not Plaintiff may be truly malingering, given some of the inconsistencies she has seen. (AR 451.) ME Monis also testified that Plaintiff indicated "varying symptoms of depressive disorders throughout the file, some of which are he doesn't want to leave home. He's not able to do things for himself. He's sad. He's not feeling well...he spends time on his computer. He doesn't go out. The home is cluttered. He has difficulty performing chores. He's not capable of tidying areas that are too large, only things that [are] accessible to him. He can only do simple meals. Going out in public makes him anxious. Seeing people makes him anxious. He doesn't like to leave his home," the symptoms she saw more evidence of were "post traumatic stress" and "ongoing anxiety" although "major depression" came up several times, preceded by PTSD, and "that, overall, he's experiencing anxiety and depression." (AR 452.)

ME Monis further stated that Plaintiff's PTSD affects him by making him experience "emotional withdrawal and isolation, some difficulty in concentration, and his mood" from depression, described above. (AR 453.) In addition, when questioned by Attorney Zalev on Plaintiff's conditions limiting his daily living activities, she said it is very difficult for her to "answer a question from six months of records and establish that a person is disabled, which requires a minimum of 12 months of ongoing symptoms and treatment" and that you are required "to have symptoms for a minimum of 12 months in order to fall into the criteria of mental disability" which the ALJ remarked as a "reference to what we have to apply in terms of whether or not a person meets the durational requirement for severity." (AR 453-55.)

ME Monis also testified that the specific trauma that Plaintiff reported as forming the basis for the PTSD diagnosis came from the Plaintiff's childhood and involved hospitalization and potential emotional, physical and/or sexual abuse from a family member, possibly a sister. (AR 456-57.) Moreover, ME Monis described the record as being "internally inconsistent" ("[f]or

example, having amnesia one year and having [a] 108 score in working memory the following. Please note that in six months of therapy, there isn't one mention of amnesia") and lacking "a history of 12 months of ongoing treatment." (AR 458-59.) ME Monis also did not reach a definite conclusion about Plaintiff's ability to handle working or substantial gainful employment given his impairments, citing to contradictory and inconsistent reports in the record. (AR 458-60.)

When Plaintiff was questioned by Attorney Zalev about his work history, he indicated that his last job was in 2006 with Tomdra, which he left after a week during training because he had "a mental breakdown because it was just far too complex." (AR 462.) He "walked out" of his job before that as a van driver for a hotel in Tucson, Arizona, that he had for four months because he missed appointments, had been written up for missing one of them and afterwards, he found it impossible to face his employers. (AR 463.) Prior to the van driver job, Plaintiff drove a truck with his friend Shawn for Swift Transportation for about six months before quitting because he never learned how to back up a trailer and never understood any of the paperwork, hence, all the work fell on Shawn, who couldn't take it after a while and who soon quit, with Plaintiff quitting at the same time because there was no way he "would be able to do it" by himself. (AR 465.) Before that, Plaintiff worked for the Brownsboro Inn, a hotel in Louisville, Kentucky, where he served in a nighttime position responsible for taking care of the kitchen, cooking breakfast for recruits for the military, cleaning up afterwards and driving those recruits to their recruiting station. (AR 465-66.) Plaintiff says he was threatened by a worker who was responsible for painting the kitchen and after that, the rest of the workers said that his "actions were very erratic for the rest of that shift" and that he remembered that he'd lost the job because of that moment. (AR 466.)

All the positions Plaintiff mentioned previously were full-time jobs he had since 2000, and he also worked a full-time clerical job for a staffing agency of the Department of Labor in Georgia where he was mainly responsible for filing W-2s for the State of Georgia. (AR 466-67.) This job also lasted a couple of months before Plaintiff quit because his co-workers were trying to pick fights with him and kick him out, and going in every day started "becoming too difficult" and "fearful for some reason." (AR 467.)  He also worked part-time at a metaphysical book store in North Georgia for about two or three years. (AR 467-78.) When asked by Attorney Zalev about

why he hasn't worked since 2006, Plaintiff said: "[i]t came to the point at which I just got tired of trying and fighting and not being able to do it. And I wanted to know what was really wrong, because I could never get an answer. I did not have a diagnosis. I did not have anything. I had no clue what in the world was going wrong. I just knew that I wasn't getting better." (AR 469-70.)

Plaintiff also testified during the hearing that the frequency of flashbacks he experiences is "very erratic" and when he experiences one, he ends up damaging his surroundings without being aware that he did so, shaking a lot, and performs angry conversations with nobody. (AR 470-71.) His flashbacks to his childhood mainly consist of memories of a sister beating him up or getting beaten by other kids at school. (AR 472.) He also said his doctor in Tucson reported to him after an X-ray that there were some deformations in his spine, and he felt a "very sharp pain" in those areas, as well as in his limbs, whenever he experienced trauma associated with anxiety. (*Id.*) Plaintiff also remarks that when he told that doctor that he'd ask for his help in this social security case, the doctor "went from telling [him] that [his spinal issues] could cause potential paralysis to it's no big deal" and he doesn't understand why his "story suddenly changed." (AR 473.) Due to these spinal issues, he also experienced pain while sitting down during a bingo game and avoids roller coasters. (*Id.*) He also testified that he could handle lifting about 50 pounds at one time. (*Id.*)

VE Berkley classified Plaintiff's prior jobs as follows: truck driver (DOT 905.663-014, exertion level: medium, specific vocational preparation (SVP): 4), van driver (DOT 913.663-018, exertion level: medium, SVP: 3), file clerk (DOT 206.387-034, exertion level: light, SVP: 3). (AR 474.) The ALJ then presented VE Berkley with a hypothetical person who had Plaintiff's age, education and work experience, a capacity for light, simple and repetitive tasks, and who also had a job requiring no public interaction (incidental contact is okay), with no more than occasional coworker interaction. (AR 474-75.) When the ALJ asked VE Berkley if there were any jobs at the light level that could be performed by this hypothetical person, VE Berkley responded with: housekeeping cleaner (e.g. could be a maid in a hotel) with a DOT of 323.587-014, exertional level: light, and an SVP of 2 (approximately 141,000 in the national economy; 15,000 in the State of California; and there is no talking or hearing required to perform this job); a mail clerk or mail sorter (e.g. someone that sorts mail all day) with a DOT of 209.687-026, exertional level: light,

and an SVP of 2 (approximately 25,800 jobs in the national economy; 12,000 in the State of California; and there is no talking but occasional hearing required for performing this job); a marker, retail (e.g. someone that tags products) with a DOT of 209.587-034, exertional level: light and an SVP of 2 (approximately 271,000 jobs in the national economy; approximately 30,000 in the State of California; and there is no talking or hearing required to perform the duties of this job). (AR 475-76.) The typical tolerances for absences from the workplace for the above mentioned jobs are also not to exceed one absence per month. (AR 476.) VE Berkley also testified that based on her professional experience, if the hypothetical employee was off task 20% of the time, they could not complete the duties of any full-time employment. (AR 476-77.) Discussing a housekeeping job, as an example, where the use of checklists in keeping track of completed tasks (which would also be turned into the supervisor at the end of the day) is customary (AR 481-82), VE Berkley also testified that the hypothetical employee would not be able to maintain employment if they were, for example, putting the wrong number of towels in 20% of the rooms, or weren't able to accept and follow simple daily instructions or criticism from supervisors. (AR 481-82.) For the jobs VE Berkeley discussed, the hypothetical employee would also need to remember simple, repetitive tasks (AR 481) and do a job within 30 days from starting (AR 484).

The ALJ issued an unfavorable decision on February 19, 2016, finding that Plaintiff had not been under a disability, as defined in the Social Security Act, since August 29, 2012, the date the application was filed. (AR 15-17, 18-30, 31-33, 34-44.) The ALJ also found Plaintiff to have the severe impairments of degenerative disc disease, spondylosis, anxiety disorder/social phobia, depressive disorder, and probable personality disorder. (AR 20.) On April 14, 2016, Plaintiff filed a request for review of the ALJ's decision. (AR 13, 124, 125.) The Appeals Council denied Plaintiff's request for review on August 1, 2017. (AR 6-10.) On August 2, 2017, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Compl., Dkt. No. 1.)

On January 9, 2018, Plaintiff filed a motion for summary judgment. (Plf.'s Mot., Dkt. No. 17.) On February 6, 2018, Defendant filed an opposition as well as cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 19.) On February 15, 2018, Plaintiff filed a reply brief. (Plf.'s Reply, Dkt. No. 20.)

## II.    LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Id.*  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under SSA regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir.1998). At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity.  *Id.*  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721.  If the answer is no, the claimant is not disabled.  *Id.*  If the answer is yes, the Commissioner proceeds to step three, and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d).  If this requirement is met, the claimant is disabled.  *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments.  20 C.F.R. § 404.1520(e). If the claimant can perform such work, he is not disabled.  20 C.F.R. § 404.1520(f).  RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity.  20 C.F.R. §

404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante*, 262 F.3d at 953-954. The burden shifts to the Commissioner in step five. *Id.* at 954.

### III.    THE ALJ'S DECISION

On February 19, 2016, the ALJ issued an unfavorable decision. (AR 15-17, 18-30.)

At step one, the ALJ determined that there was no evidence that Plaintiff engaged in substantial gainful activity since August 29, 2012, the application date. (AR 20.)

At step two, the ALJ identified the following severe impairments: degenerative disc disease, spondylosis, anxiety disorder/social phobia, depressive disorder, and probable personality disorder. (*Id.*) The ALJ stated that the above listed medical impairments were severe because they more than minimally limited the Plaintiff's ability to perform basic work activities. (*Id.*) Moreover, the ALJ notes that even though the representative asserted Plaintiff's health problems included asthma and gastroesophageal reflex disease (GERD) (AR 239-48), these two conditions are not severe impairments because they are controlled and there is also no evidence that they affect Plaintiff's ability to perform basic work activity. (AR 20.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*) The ALJ explained that "the medical records do not describe limitation of motion in the spine with motor loss and sensory or reflex loss, as required by section 1.04 for a listing level disorder of the spine." (AR 21.) The ALJ further explained that the "severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." (*Id.*)

In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, and to do so, the mental impairments of Plaintiff must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. (*Id.*) A marked limitation means

more than moderate but less than extreme, and repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. (*Id.*) In activities of daily living, the ALJ found that Plaintiff had a mild restriction because he reported being able to prepare meals almost daily, perform household chores such as laundry and cleaning with encouragement, use public transportation, drive, and according to Dr. Sardy's evaluation, describe no problems with the activities of daily living and manage his own finances. (AR 22.) In social functioning, the ALJ found that Plaintiff had moderate difficulties because he reported spending time with friends, attending movies, playing games, attending local events two to three times per month (although he needed encouragement), stated – at Dr. Schnurr's evaluation – that he had a supportive boyfriend and friends in a motor cycle group, informed Dr. Kalich that he consumed beer socially every few weeks, and according to the progress notes, Plaintiff stated he attends the gym and lifts weights several times per week. (*Id.*) For concentration, persistence or pace, the ALJ found that Plaintiff had mild difficulties because he reported that he went grocery shopping two times per week, used public transportation, was able to drive, and in August 2012, Plaintiff informed Dr. Kayman that he read books to pass time and that he used the Internet "a lot." (*Id.*) In January 2013, Plaintiff even indicated that he was working on a book and in July 2013, Plaintiff was able to complete psychometric testing and achieved a Full Scale IQ of 122. (*Id.*) The ALJ found no evidence of decompensation.[2] (*Id.*) Therefore, because Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. (*Id.*)

The ALJ also found that the "paragraph C" criteria were not satisfied because the records did not indicate episodes of decompensation,[3] or a residual disease process that has resulted in such marginal adjustment that a minimal increase in mental demands or environment would be

---

[2] Decompensation, or decompensate is defined as "to lose the ability to maintain normal or appropriate psychological defenses, sometimes resulting in depression, anxiety, or delusions." *See* https://www.dictionary.com/browse/decompensate.

[3] The term "episodes of decompensation" is "used by psychiatrists and psychologists to describe the deterioration of the mental health of an individual who, up till that point, was maintaining his or her mental illness." *See* https://www.disabilitysecrets.com/mic2.html

predicted to cause decompensation, or an inability to function outside a highly supportive living arrangement, or finally a complete inability to function independently outside the area of the Plaintiff's home. (*Id.*) The ALJ also notes that the limitations identified in the "paragraph B" criteria are not a residual functional capacity ("RFC") assessment, but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. (*Id.*) Thus, the mental RFC assessment utilized at steps 4 and 5 requires a more detailed assessment that itemizes various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p). (*Id.*) Thus, the RFC assessment reflects the degree of limitation that the ALJ found in the "paragraph B" mental function analysis. (*Id.*)

At step four, the ALJ determined that Plaintiff had the RFC to perform medium work as defined in 20 CFR 416.976(c), except that Plaintiff could perform non-public simple repetitive tasks in positions that require no more than occasional interaction with co-workers (although incidental public contact can be tolerated, however). (AR 22-23.) In making this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p, and also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (AR 23.)

The Plaintiff initially alleged disability based on "various mental and physical impairments." (AR 23, 129, 209.) Counsel for Plaintiff also alleged that Plaintiff experienced the impairments of generalized anxiety disorder, major depressive disorder, social anxiety disorder, PTSD, avoidant personality disorder, panic disorder, personality disorder, asthma, GERD, back pain, scoliosis and spina bifida occulta. (AR 23, 241.) In a June 2013 Function Report, Plaintiff contended that his impairments affected his ability to speak, hear, memorize, complete tasks, concentrate, understand, follow instructions (if at home but not at work and could not handle any stress), get along with others, walk for 30 minutes before needing to rest, and having to use a cane on rare occasions (2 to 3 times per year for periods that could last for weeks) due to sciatic pain. (AR 23, 224-25.) At the hearing, Plaintiff also testified that he has not worked since 2006 and has primarily been supported by friends. (AR 23, 435-38, 462-71.)

The ALJ then found, upon careful consideration of the evidence, that Plaintiff's medically determinable impairments could reasonably be expected to cause some alleged symptoms but the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible for reasons explained in his decision. (AR 23.) The ALJ further noted that the treatment record concerning physical conditions was sparse and primarily reflected routine care. (*Id.*) For example, the Plaintiff exhibited mild shortness of breath in connection with pneumonia in 2013, but there were no persistent respiratory complaints throughout the record. (AR 23, 297.) Nonetheless, there was only one complaint of back pain (from July 2012), and providers noted that Plaintiff was working out at a gym two to three times per week. (AR 23, 282, 296-97, 300-05, 308-12, 378-95.)

Next, the ALJ addressed the opinion evidence for both Plaintiff's physical and mental conditions. For Plaintiff's physical conditions, the opinion evidence consisted of evaluations from consultative examiners Drs. Rana, McMillan and Hernandez, as well as Dr. Williams, an examining state agency medical consultant. (AR 24.) In assessing the physical component of the residual functional capacity ("RFC"), the ALJ gave greatest weight to Dr. Rana's assessment, and less weight to the opinions of Drs. McMillan, Hernandez, and Williams because "Dr. Rana was the only examining source that reviewed imaging studies of the back, thus giving him greater insight into the claimant's back pathology." (*Id.*)

For Plaintiff's mental conditions, the opinion evidence consisted of evaluations from Dr. Weibe (examining), Dr. Flastro (examining), Dr. Kayman (treating), Dr. Sardy (consultative examiner), Dr. Schnurr (examining), Dr. Lucila (non-examining), Dr. Edmunds (treating), Dr. Kalich (examining), Melissa Anderson, Licensed Marriage and Family Therapist ("LMFT") (treating) and Dr. Monis, the medical expert (ME) that testified at the administrative hearing on January 20, 2016 based on her review of the medical evidence in the record. (AR 24-28.)

The ALJ accorded great weight to Dr. Lucila's assessment because her conclusions were consistent with the treatment record that reflected few mental status abnormalities and a positive response to medication. (AR 28.) The ALJ also accorded great weight to Dr. Monis' opinion because she had "the most complete record to review." (*Id.*) The ALJ accorded little weight to the

opinions of Drs. Weibe, Sardy, Schnurr and Kalich because their assessments were "based on one-time examinations," "they did not have the benefit of reviewing the underlying treatment record," and their conclusions were "based largely on the claimant's self-reports" where "contemporaneous treatment notes show[ed] virtually no clinical abnormalities." (*Id.*) The ALJ also accorded little weight to the GAF scores of 41 and 45 that Drs. Weibe and Kayman respectively obtained from Plaintiff because "all progress notes show[ed] little to no mental status abnormalities. In other words, the scores are inconsistent with the clinical data and narrative reports." (*Id.*)

The ALJ concluded that the evidence failed to support greater limitations than provided in the RFC. (*Id.*) Specifically, the ALJ held that the physical examination findings did not support the assertions that Plaintiff can only walk 30 minutes or that he requires a cane two to three times per year due to sciatic pain, as there is only one complaint of back pain since 2012. (*Id.*) The ALJ also held that Plaintiff's reported social phobia and avoidance of going out were inconsistent with reports he made to providers stating that he worked out at the gym several times a week (AR 300), spent time with friends attending movies, playing games or attending local events two to three times per month (AR 223, 351), that he walked a lot (AR 398), went to a Halloween party and took a trip to Disneyland (AR 422), all activities that the ALJ concluded were not consistent with allegations of debilitating social phobia. Moreover, the ALJ notes that Dr. Kayman remarked Plaintiff wanted disability paperwork completed at his first visit and was "flustered" to find out that was not possible. (AR 314.) This led the ALJ to state "[t]hat suggests that the claimant's motive for that visit was not treatment, but was to obtain documentation for his claim." (AR 28.)

At step five, the ALJ found the Plaintiff unable of performing any past relevant work. The ALJ notes that VE Berkley classified Plaintiff's past work as a truck driver (DOT 900.566-013, medium exertion, SVP 4), van driver (DOT 913.663-018, medium exertion, SVP 3) and file clerk (DOT 206.387-034, light exertion, SVP 3). (*Id.*) Based on the mental limitations of Plaintiff, the ALJ therefore found that the demands of Plaintiff's past relevant work exceeded the RFC. (*Id.*) Furthermore, considering the Plaintiff's age, high school education, ability to communicate in English, RFC, work experience, and how transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that Plaintiff is "not disabled" (whether or not the Plaintiff has transferable job skills), the ALJ concluded that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform. (AC 29.)

The ALJ stated that he asked VE Berkley whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (*Id.*) VE Berkley testified that given all of these factors, that individual would be able to perform the requirements of the following representative occupations (AR 29-30) as reflected below:

- Housekeeper (DOT 323.687-014), light exertional level, SVP 2, 11,000 positions in the national economy and 15,000 in California
- Mail clerk/Sorter (DOT 209.687-026), light exertional level, SVP 2, 25,800 positions in the national economy and 1,200 in California
- Marker, Retail (DOT 209.587-034), light exertional level, SVP 2, 271,000 positions in the national economy and 30,000 in California

The ALJ also determined, pursuant to SSR 00-4p, that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles ("DOT"). (AR 30.) Therefore, based on the testimony of VE Berkley, the ALJ concluded that considering Plaintiff's age, education, work experience and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and a finding of "not disabled" is therefore appropriate. (*Id.*) As a result, the ALJ found Plaintiff not being under a disability, as defined in the Social Security Act, since August 29, 2012, the date the application was filed. (AR 30.)

## IV. DISCUSSION

Plaintiff appeals the ALJ's decision on six presented issues. First, did the ALJ err in evaluating the medical opinions? (Plf.'s Mot. at 5.) Second, did the ALJ err in failing to find Post-Traumatic Stress Disorder (PTSD) and Panic Disorder severe impairments at step two? (*Id.*) Third, did the ALJ err in determining Plaintiff's RFC? (*Id.*) Fourth, did the ALJ err in evaluating Plaintiff's credibility? (*Id.*) Fifth, did the Appeals Council err in rejecting material evidence? (*Id.*) Sixth and finally, should the Court remand for payment of benefits or further proceedings? (*Id.*)

### A.    The ALJ's Evaluation of The Medical Opinions

In evaluating medical evidence from different physicians, the Ninth Circuit distinguishes among the opinions of three types of physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The three types are classified as: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Id.* "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Where the record contains conflicting medical evidence, the ALJ must make a credibility determination and resolve the conflict. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003)). "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citations omited).

Plaintiff argues that the ALJ erred in evaluating the medical opinions, specifically in giving little weight to the opinions of Drs. Wiebe, Sardy, Schnurr, and Kalich and treating source Dr. Kayman in providing GAF scores of 45, and in giving great weight to the opinions of the non-examining, non-treating ME Dr. Monis and the non-examining source Dr. Lucila. (*Id.* at 7-19).

### 1.    Drs. Wiebe, Sardy, Schnurr & Kalich

Specifically, for the four examining psychologists Drs. Wiebe, Sardy, Schnurr, and Kalich, Plaintiff argues that the "ALJ failed to provide reasons specific to any one of these evaluations for rejecting their conclusions" and "[f]urthermore, even if the ALJ's reasons had been specific, the stated reasons were neither legitimate nor supported by substantial evidence." (*Id.* at 8-9.)

For example, Plaintiff argues that the ALJ failed to provide any reasons specific to Dr. Wiebe for discounting her opinion, aside from it being a one-time examination. (*Id.* at 9.) Plaintiff also states that examining physicians like Dr. Wiebe by definition perform limited-scope examinations, thus, the law requires ALJs to provide specific and legitimate reasons, supported by substantial evidence, to reject the opinion of examining physicians. (*Id.* at 10.) Plaintiff further

argues that the ALJ should not have discounted Dr. Wiebe's opinion based on how she did not review the underlying treatment records because Dr. Wiebe reviewed the treatment records that were available at the time. (*Id.*) Plaintiff provides similar reasons as to why he feels the ALJ gave insufficient weight to Dr. Sardy's opinion, e.g. the ALJ's stated reasons for discounting Dr. Sardy's opinion (it was a one-time examination, Dr. Sardy did not review underlying treatment records, but he did review the prior ALJ decision which contained an overview and discussion of treatment records) are neither specific, nor legitimate nor supported by substantial evidence. (*Id.* at 12.) Plaintiff argues the same for the ALJ discounting the opinions from Drs. Schnurr and Kalich, e.g. the ALJ's reliance on how they were one-time examinations and how the Doctors did not review the underlying treatment records and relied largely on Plaintiff's self-reports (e.g. they also relied on their own examinations, interviews and observations) were neither specific nor legitimate nor supported by substantial evidence. (*Id.* at 13-15.)

In response, Defendant argues that the ALJ reasonably accorded little weight to the conflicting and unsupported opinions of Drs. Wiebe, Sardy, Schnurr and Kalich because he explained that their conclusions were largely based on Plaintiff's self-reports and contemporaneous treatment notes that showed virtually no clinical abnormalities, and that their assessments were based on one-time examinations uninformed by the benefit of the underlying treatment records. (Def.'s Opp'n at 7.) Defendant also argues that the ALJ reasonably found that the opinions of the examining sources were not supported by the virtually normal clinical findings, e.g., Plaintiff's treatment records contained generally normal mental status examinations and Dr. Kayman even reported that Plaintiff was doing fine and that medication was helping his symptoms. (*Id.* at 7.) Defendant further asserts that the ALJ reasonably concluded, in light of the unremarkable treatment notes, that the examining source opinions were based on Plaintiff's subjective complaints and unreliable statements. As a result, Defendant argues that the ALJ appropriately discounted those examining source opinions because they appeared to be premised on Plaintiff's unreliable statements as well as not fully credible complaints. (*Id.* at 7-8) (citing *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.")).

Defendant additionally contends that the ALJ permissibly considered that the examining sources provided their opinions based on one-time assessments and did not have the benefit of underlying treatment records because even though an examining physician can provide an assessment, the source's assessment has to be supported by other record evidence; thus, as the fact-finder, the ALJ properly found that the examining source opinions were not supported by Plaintiff's treatment notes (*Id.* at 8.)

In reply, Plaintiff argues that Defendant fails to cite any legal authority to support the ALJ's two-sentence simultaneous rejection of four examining sources, "all of whom reached the same conclusion that Plaintiff is disabled." (Plf.'s Reply at 2.) Plaintiff also asserts that each of the four examining sources of Drs. Wiebe, Sardy, Schnurr and Kalich agreed on the ultimate conclusion that "Plaintiff's mental impairments preclude[d] him from performing competitive, renumerative work on a sustained basis" by each assigning Plaintiff an RFC that would preclude all work at Step Five. (*Id.* at 2-3.) Thus, Plaintiff argues that each of their opinions was consistent with the overall record and the only sources in the record that opined that Plaintiff's RFC did not preclude all work were the non-examining, non-treating sources. (*Id.* at 3.) Plaintiff also contends that Defendant relies on cases in which the ALJ rejected the opinion of an examining or treating physician(s) in favor of another examining or treating physician(s). (*Id.*) Plaintiff also argues that the ME Dr. Monis may have general qualifications and may possess general expertise, but she was not qualified to give an opinion on Plaintiff's impairments because she had not reviewed the complete record (which did not contain contradictory data as she opined) prior to the hearing, and she "mischaracterized the record" because it did, in fact, contain ongoing therapy notes from Melissa Anderson. (*Id.* at 4-5.) Plaintiff further attacks the ALJ's reliance on Dr. Lucila and argues that Defendant misstated that Plaintiff had mild-to-moderate test results due to the "marked-to-extreme limitations" that Dr. Wiebe observed in Plaintiff being supported by testing showing that Plaintiff is "experiencing a severe mental disorder." (*Id.* at 5-6.) Plaintiff further asserts that Defendant mischaracterizes as "unremarkable" some of Plaintiff's mental status examinations, including Dr. Schnurr opining that Plaintiff had an "anxious affect and depressed mood" and Dr. Kayman opining that Plaintiff had an "anxious mood with congruent affect." (*Id.* at 6.)

18

Upon consideration of the arguments from both parties, the Court finds that the ALJ did not err in assigning little weight to the opinions from the four examining psychologists of Drs. Wiebe, Sardy, Schnurr, and Kalich. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Ryan*, 528 F.3d at 1198)). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Contrary to Plaintiff's argument, the ALJ provided specific and legitimate reasons as to why he rejected the opinions of the four examining psychologists. For example, the ALJ explained that the aforementioned four opinions were largely based on Plaintiff's self-reports, contemporaneous treatment notes showing virtually no clinical abnormalities and one-time examinations uninformed by the benefit of reviewing underlying treatment records. (AR 28.) Thus, the Court finds these explanations from the ALJ setting forth his own interpretations as to why he accorded the four examining physicians little weight as specific and legitimate reasons supported by substantial evidence that also go beyond mere conclusions.

## 2. **Dr. Kayman's GAF Scores**

Plaintiff further argues that the ALJ erred in giving little weight to the opinion of treating provider source Dr. Joshua Kayman, who gave him a GAF (global assessment of functioning) score of 45 on multiple occasions in 2012, 2013, and 2014. (Plf.'s Mot. at 15.) The ALJ also gave "little weight" to Dr. Kayman's GAF scores "because all progress notes show little to no mental status abnormalities. In other words, the scores are inconsistent with the clinical data and narrative reports." (*Id.*) Plaintiff contends that a GAF score of 45 indicates either serious symptoms "OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (4th ed. 1994) ("DSM-IV"). Plaintiff contends that a GAF score of 45 is consistent

with a lack of mental status abnormalities because the evidence shows Plaintiff has serious impairments in both occupational and social functioning, and furthermore, the progress notes showed mental status abnormalities on various occasions, including anxious mood and affect, as well as fair insight and judgment. (Plf.'s Mot. at 15.)

In response, Defendant asserts that Plaintiff is incorrect in arguing that the ALJ erred in assigning little weight to "the opinion of treating source Dr. Kayman." (Def.'s Opp'n at 9.) Defendant argues that Dr. Kayman did not provide a medical opinion, even though he noted that Plaintiff had "high hopes that [Dr. Kayman] would fill out his disability paperwork" and was "quite flustered to find out that wasn't possible." (AR 306, 314.) Even though Dr. Kayman gave Plaintiff a GAF score of 45, Defendant avers that GAF scores are not medical opinions and provide at most only a snapshot of a claimant's functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorder* 34 (Text Rev., 4th ed. 2000) ("DSM-IV-TR") (A GAF score ranges from a rating of 0 to 100, and is divided into ten ranges which consider and provide an assessment of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" at the time of the evaluation); *Vargas v. Lambert*, 159 F.3d 1161, 1162 n.2 (9th Cir. 1998) (a "GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment"). Defendant also points out that Plaintiff was notably assessed with a GAF of 55 (indicating moderate symptoms) a couple of weeks before Dr. Kayman rated Plaintiff with a GAF of 45 (indicating serious symptoms). (Def.'s Opp'n at 9.) Defendant then concludes that the ALJ rightly explained that he gave little weight to the GAF scores of 45 provided by Dr. Kayman and his staff because the scores were inconsistent with the minimal mental status abnormalities contained in the clinical data. (*Id.*) As a result, Defendant argues that the Court should uphold the ALJ's reasonable interpretation of the evidence because the ALJ's opinion was based on a reasonable interpretation of the record and the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041-42 (9th Cir. 2008); *see also Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld").

In reply, Plaintiff disputes Defendants citation and interpretation of the *Vargas* case and argues that *Vargas* actually has direct correlative work-related or functional limitations because a GAF score can indicate at least moderate symptoms or difficulty in psychological, occupational or social functioning. (Plf.'s Reply at 7) (citing *Vargas*, 159 F.3d at 1164, n.2). Thus, Plaintiff argues that a GAF score is in fact an opinion and Dr. Kayman is indicating with a GAF score of 45 that Plaintiff had either serious symptoms or a serious impairment in social, occupational or school functioning on multiple occasions from 2012-2014. (Plf.'s Reply at 7) (citing DSM-IV at 33).

On balance, the Court finds that the ALJ did not err in according little weight to the GAF scores supplied by Drs. Weibe (GAF score of 41) and Kayman (GAF score of 45). (AR 25, 28, 302, 306, 307, 313, 399.) The ALJ provided specific and legitimate reasons supported by substantial evidence in discounting these GAF scores because he noted that "all progress notes show little to no mental status abnormalities" and in other words, "the scores are inconsistent with the clinical data and narrative reports." (AR 28.) For example, just comparing the GAF scores themselves, licensed marriage and family therapist (LMFT) Melissa Anderson provided Plaintiff with a GAF score of 62 in December of 2015 based on weekly treatment beginning July 21, 2015. (AR 27.) Dr. Flastro also assigned Plaintiff a GAF score of 55 (AR 25) and Dr. Sardy provided Plaintiff with a GAF score of 53 (AR 26); thus, most of the scores (53, 55, 62), which indicate "moderate" to above moderate psychological/occupational/social functionality, are on average 10-20 points higher than the GAF scores ascribed by Drs. Weibe and Kayman (41, 45), which may indicate "serious impairment" in social/occupational/school functioning. DSM-IV at 33. The Court also agrees with Defendant that GAF scores are less formal medical opinions and more "rough estimate" snapshots of "an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment" at the time of evaluation. *Vargas,* 159 F.3d at 1162 n.2. What else would explain the 10-20 point variance in GAF score measurements performed by multiple different medical professionals at multiple different times?

Dr. Kayman's GAF score of 45 (indicating "serious" symptoms or impairments) is also inconsistent with notes from his treatment of Plaintiff, including how he wrote that Plaintiff had "high hopes that [Dr. Kayman] would fill out his disability paperwork" and was "quite flustered to

find out that wasn't possible" – thereby implying that Plaintiff's "motive for that visit was not treatment, but was to obtain documentation for his claim." (AR 28, 306, 314.) Dr. Kayman also reported that Plaintiff was doing fine, seeing a boyfriend he really liked (who he eventually moved in with), working on a book, working out at the gym, and was tolerating medication well and experiencing less depression. (AR 26, 302, 306-07, 395, 397.) The treatment notes from Dr. Kayman also indicated no exacerbations of symptoms, changes in clinical findings or additional mental health diagnoses, and progress notes related to physical treatment suggested that Plaintiff's mental health symptoms were being adequately managed. (AR 26.) Dr. Edmonds, who worked with Dr. Kayman at LifeLong Medical Care, also noted that Plaintiff's anxiety was controlled on medication. (*Id.*) Treatment notes from other examiners also indicate that in addition to working out at the gym several times a week, Plaintiff also spent time with friends, attended movies, played games, attended local events two to three times per month, walked "a lot," went to a Halloween party and took a trip to Disneyland, all activities that were in the ALJ's view as being "not consistent with allegations of debilitating social phobia." (AR 28.) Therefore, as shown above, the ALJ provided more than sufficiently specific and legitimate reasons supported by substantial medical evidence from the record to justify his decision to accord little weight to the GAF scores of Drs. Kayman and Weibe. As a result, the Court finds that the ALJ did not err in giving those GAF scores such minor weight. *See Tommasetti,* 533 F.3d at 1041-42 (the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence.")

### 3. Drs. Monis & Lucila

Plaintiff next argues that the ALJ erred in giving great weight to the opinions of Dr. Monis (Plf.'s Mot. at 15-18) and Dr. Lucila (*Id.* at 18-19).

### a. Dr. Monis

For Dr. Monis, who Plaintiff notes is a "non-treating, non-examining medical expert," Plaintiff contends that the ALJ erred in according great weight to her testimony during the administrative hearing because even though Dr. Monis may have had access to the complete record, she did not review the full record and her statements at the hearing indicated that she had perhaps reviewed some parts of the record but not all of it, even though the ALJ concluded that

"she had the most complete record to review." (*Id.* at 15-17.) For example, Plaintiff points to how, during the hearing, Dr. Monis seemed to be unaware that the record contained any psychological treatment notes, despite how she had received those notes as part of the record and acknowledged that the record contained handwritten therapy notes. (*Id.* at 16-17.) Plaintiff also alleges that Dr. Monis categorized some medical evaluations that took place multiple times as "single evaluations" and also argues that Dr. Monis' opinion was "brief, conclusory, and inadequately supported by clinical findings." (*Id.* at 17.) Plaintiff further contends that just like how the opinions of the four examining psychologists discussed above were given little weight by the ALJ because they "did not have the benefit of reviewing the underlying treatment record," Dr. Monis didn't review the entire record, was unaware that an underlying treatment record existed, and could also not distinguish between treating, examining and non-treating, non-examining medical sources, grouping them all together as single examinations. (*Id.* at 18.) Plaintiff additionally maintains that Dr. Monis' opinion was unreliable, unsupported, and based on her faulty, incomplete review of the record, because her testimony was contradicted by, in Plaintiff's view, "all the evidence in the record except for the opinions of the non-examining, non-treating DDS consultants, and even Dr. Lucila's opinion is more limiting and does not support Dr. Monis' conclusion." (*Id.* at 18.)

In response, Defendant argues that the ALJ properly gave great weight to the opinion of Dr. Monis that Plaintiff could work with limitations for public interaction, which was also supported by Plaintiff's treatment records. (Def.'s Opp'n at 6.) Defendant also affirms the ALJ's conclusion that Dr. Monis was "highly qualified" and an "expert" in "Social Security disability evaluation," and correctly reasoned that the "examining medical opinions contained contradictory data and conclusions." (*Id.* at 3.) Defendant also notes that the ALJ considered how Dr. Monis had the benefit of the entire record when she provided her opinion. (*Id.*) In a footnote, Defendant further argues that contrary to Plaintiff's contention, Dr. Monis did not mischaracterize the record because Dr. Monis accurately testified that the record contained a number of reports of single examinations, that there were no ongoing therapy notes and that there were therapy notes from LMFT Melissa Anderson. (*Id.* at 6, n.3.) Defendant also argues that the ALJ reviewed the entire record before assessing Plaintiff's functional capacity to work. (*Id.*)

In reply, Plaintiff contends that Dr. Monis may have general qualifications and may possess general expertise, but she was not qualified to give an opinion on Plaintiff's impairments because she had not reviewed the complete record prior to the hearing. (Plf.'s Reply at 4.) Plaintiff also maintains that opposed to the statement made by Dr. Monis that the examining medical opinions contained contradictory data and conclusions, all the examining medical opinions contained the same ultimate conclusion. (*Id.*) Plaintiff further argues that Dr. Monis couldn't have benefited from the treatment records when she did not review them. (*Id.*) Plaintiff also asserts that even if Dr. Monis had reviewed the full record prior to the hearing and even if she had not mischaracterized it, the ALJ could not permissibly rely on her qualifications and expertise as reasons to justify rejecting the opinions of the aforementioned four examining sources because Dr. Monis is a non-examining source and her opinion, alone, cannot constitute substantial evidence, no matter how well qualified she is or how much expertise she possesses. (*Id.* at 5.)

Upon consideration of the parties' arguments, the Court finds that the ALJ did not err in giving great weight to the opinion of Dr. Monis because his reasoning for doing so was specific and legitimate and also supported by substantial evidence. Specifically, the reason why the ALJ accorded great weight to Dr. Monis' opinion was "because she had the most complete record to review." (AR 28.) This statement does not assume that she reviewed everything in the record, nor does it somehow require her to. Instead, all the ALJ was saying was that Dr. Monis had the benefit of a complete record before her to make an assessment as a "highly qualified" medical expert who is also an expert "in Social Security disability evaluation." 20 C.F.R. § 416.927(e). Thus, the Court does not find persuasive Plaintiff's argument that Dr. Monis had to review the full record for her opinion to be given great weight. The ALJ also gave great weight to Dr. Monis' opinion because it was consistent with the rest of the record, e.g. that "many of the mental status examinations were normal and that the scores from the MMSEs did not indicate cognitive dysfunction." (AR 28.)

Furthermore, Plaintiff's argument that Dr. Monis mischaracterized the record is of no moment, not only because she later corrected herself and acknowledged that there were therapy notes from LMFT Melissa Anderson (AR 440, 444), but also because the ALJ notes that Dr. Monis indicated that there "was a *paucity* of treatment records" (AR 28), not a complete absence

24

of them. The testimony of Dr. Monis can also be properly followed by the ALJ even though she is a "non-treating, non-examining medical expert" as Plaintiff argues because the ALJ has provided specific and legitimate reasons supported by substantial evidence for according Dr. Monis' opinion great weight. *See Garrison,* 759 F.3d at 1012. An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. The ALJ did just that, by providing a detailed summary of Dr. Monis' findings and its consistency with the other medical evidence and also describing why he gave those findings such great weight. (AR 27-28.) The ALJ also properly resolved the contradictory evidence Dr. Monis observed in the record by reaffirming her opinion's consistency with the rest of the medical examination record. *See Tommasetti,* 533 F.3d at 1041-42 (the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence.") Thus, the Court finds that the ALJ did not err in giving the opinion of Dr. Monis great weight.

### b. Dr. Lucila

Plaintiff also argues that the ALJ erred in giving great weight to the opinion of Dr. Lucila that Plaintiff could perform simple work with limited public contact "because those conclusions are consistent with the treatment record, reflecting few mental stats abnormalities and a positive response to medication" because every examining physician in the record found greater limitations than Dr. Lucila, who found only moderate limitations in three areas. (Plf.'s Mot. at 18.) Plaintiff further contends that the opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician, and that Dr. Lucila's opinion was brief, conclusory, and inadequately supported by clinical findings. (*Id.* at 18-19.)

In response, Defendant asserts that the ALJ properly gave great weight to Dr. Lucila's assessment that Plaintiff could perform at least simple work with limited public contact because Dr. Lucila's conclusions were consistent with the treatment record showing few mental status abnormalities and improvement with medication. (Def.'s Opp'n at 4.) Defendant also confirms the ALJ's findings that Plaintiff's mental status examinations were generally unremarkable in that they

25

showed "mild-moderate impairments" (Dr. Wiebe), "Plaintiff's mental status examination was completely normal" he "was alert, was fully oriented, was engaged and exhibited normal speech, had a euthymic (normal) mood, had an appropriate affect, had good insight and judgment, had a logical thought process, and had no suicidal ideations" (Sausal Creek Outpatient Clinic), "Plaintiff had a cooperative attitude, normal mood, linear and goal-directed thought process, fair insight and judgment, and no hallucinations or suicidal ideation" (Dr. Kayman), "Plaintiff scored a 28/30 on the MMSE" and "had an anxious affect and depressed mood, but normal speech, there was no evidence of psychosis or confusion, and his insight and judgment seemed intact" (Dr. Schnurr) and "Plaintiff had an anxious mood with congruent affect, but also had a cooperative attitude, unremarkable speech, a linear and goal-directed through process, fair insight and judgment, and no hallucinations or suicidal ideation" (Dr. Kayman). (*Id.* at 4-5.)

Moreover, as the ALJ further considered, treatment notes indicated that Plaintiff had a positive response to medication. (*Id.* at 5) (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.") For example, in October 2012, Plaintiff reported that medication (e.g. Zoloft) made his depression "manageable" (Dr. Rana), in January 2013, Plaintiff took medication (Wellbutrin) and it was "being tolerated well" (AR 302), was "doing fine," works out at the gym and seeing "a lot of results with working out," seeing someone who he really liked, and was "doing fine living with old friend" and took medications including Citalopram, lisinopril and pravastatin (Dr. Kayman), in November 2014, Plaintiff's depressive disorder was "[c]urrently doing well" and medication was continued, including 10mg Citalopram and Wellbutryn, and his asthma was "[c]ontrolled with albuterol" and his gastroesophageal reflux disease (GERD) was "well controlled" with current treatment with the medication of omeprazole being continued, and he was taking atorvastatin and citalopram (Dr. Edmunds), and in December 2014, Plaintiff was "doing well" on citalopram and Wellbutrin "and is likely to continue to do well on those doses" (Dr. Kayman). Thus, Defendants conclude, Plaintiff's generally unremarkable treatment notes supported Dr. Lucila's opinion that Plaintiff had no disabling mental limitations. (*Id.* at 6.)

In reply, Plaintiff points out how Dr. Lucila is a non-examining source, and argues that his opinion, alone, cannot constitute substantial evidence, no matter how qualified he is or how much expertise he possesses. (Plf.'s Reply at 5.) Plaintiff also argues that the ALJ's reliance on Dr. Lucila's assessment because it was "consistent with the treatment record, reflecting few mental status abnormalities and a positive response to medication" misstates the findings in the record, in particular Dr. Wiebe's actual findings that Plaintiff's functioning is worse than mild to moderate impairments and actually "marked-to-extreme limitations" that lead to the Plaintiff's conclusion that he "is experiencing a severe mental disorder." (*Id.* at 5-6.) Plaintiff also references that even though Defendant characterizes as "unremarkable" some of Plaintiff's mental status examinations, there was one examination with Dr. Schnurr in which Plaintiff had an "anxious affect and depressed mood" and an examination with Dr. Kayman in which he had an "anxious mood with congruent effect." (*Id.* at 6.) Plaintiff finally argues that Dr. Lucila did not review all the records because some records were submitted after Dr. Lucila's review. (*Id.*)

For reasons similar to the above analysis performed for the opinion of Dr. Monis, the Court finds that the ALJ did not err in according great weight to the opinion of Dr. Lucila. The ALJ provided specific and legitimate reasons supported by substantial evidence in according great weight to Dr. Lucila's opinion because he stated that Dr. Lucila's conclusions "are consistent with the treatment record, reflecting few mental status abnormalities and a positive response to medication." (AR 28.) This evaluation of Dr. Lucila's assessment has voluminous support in the medical evidence record, as detailed above (Def.'s Opp'n at 5-6), and therefore, is a justifiable conclusion that the ALJ can properly make. As to the few evaluations that Plaintiff points out that are present in the record as possibly contradicting this overarching theme of "few mental status abnormalities" and a "positive response to medication," they are outliers that have been properly rejected due to the ALJ's specific and legitimate reasoning, supported by substantial evidence, that the treatment record predominantly reflects Plaintiff having mild to moderate impairments that have responded well to treatment. Here, the ALJ satisfied the substantial evidence requirement, and provided a detailed summary (AR 27-28) of Dr. Lucila's findings and its consistency with the other medical evidence to explain why he gave Dr. Lucila's assessment such great weight.

*Reddick*, 157 F.3d at 725. The ALJ also properly resolved the contradictory evidence Dr. Lucila observed in the record (e.g. Dr. Wiebe's opinion) by reaffirming how the rest of the treatment record reflected few mental status abnormalities and a positive response to medication. Thus, the Court finds that the ALJ did not err in giving the opinion of Dr. Lucila great weight.

**B.     The ALJ's Finding that PTSD & Panic Disorder were Not Severe Impairments**

Plaintiff next argues that the ALJ erred in failing to find PTSD and Panic Disorder as severe impairments during Step Two. (Plf's Mot. at 19.) Plaintiff defines Step Two as a "limited inquiry" where a medical impairment is found non-severe only if the medical evidence clearly shows it is a slight abnormality having no more than a minimal effect on work-related abilities. (*Id.*) Plaintiff asserts that the ALJ incorrectly held that the record did not adequately establish PTSD or panic disorder because "details of the trauma(s) are sparse and inconsistent" and that even though Plaintiff reported flashbacks of childhood abuse and potential sexual abuse by his family, Plaintiff once reported having no memory of sexual abuse, and suspected, at another time, that he "may have been" sexually abused. (*Id.* at 12.) Plaintiff avers that he was diagnosed with PTSD by his treating therapist, Melissa Anderson and that his former treating provider Dr. Kayman also diagnosed him with Panic Disorder with Agoraphobia and gave him a rule-out diagnosis for PTSD. (*Id.* at 19-20.) Plaintiff also points out that Drs. Wiebe, Schnurr and Kalich diagnosed him with PTSD and that each one of these providers felt that these conditions had a significant effect on his work-related abilities, which is sufficient, in Plaintiff's view, to overcome the "de minimis" Step Two inquiry. (*Id.* at 20.) Plaintiff also states in a prior ALJ decision from May 18, 2012, the ALJ there (Lauren R. Mathon) found that PTSD was a severe impairment at Step Two. (*Id.* at 20.) Because the present ALJ, Richard P. Laverdure, found that "there has been a change of circumstances" that overcame the presumption of continuing non-disability, Plaintiff argues that ALJ Lavedure fails to explain how Plaintiff's impairments have become more severe while, at the same time, one of his previously severe impairments became non-severe. (*Id.* at 20.)

In response, Defendant states that Plaintiff's argument that the ALJ improperly assessed his PTSD and Panic Disorder is without merit. (Def.'s Opp'n at 9.) Defendant then asserts that if a claimant has a medically determinable impairment, at Step Two of the sequential evaluation

process, the ALJ determines whether it is a "severe" impairment, and impairment is "severe" only if it significantly limits an individual's ability to perform basic work activities for at least a 12-month consecutive period. (*Id.*) Defendant further states that even if the ALJ errs in evaluating an impairment at Step Two, any error is harmless if the ALJ considers the impairment later in the sequential analysis. (*Id.* at 9) Therefore, the Defendant argues that even if the ALJ erred in not finding PTSD or Panic Disorder to be severe impairments – specifically, the ALJ found PTSD and Panic Disorder were not severe or sufficiently established by the record – any error is harmless because the ALJ discussed the mental health evidence later on in the sequential evaluation analysis, e.g. in considering Plaintiff's mental health symptoms in assessing Plaintiff's RFC. (*Id.*)

In reply, Plaintiff disputes Defendant's argument that the ALJ considered PTSD and Panic Disorder later on in his sequential analysis because if the ALJ had considered these disorders at Step Five, the ALJ would have assigned a more limited RFC that included absences from work and being off-task due to Plaintiff's panic attacks and flashbacks. (Plf.'s Reply at 7.)

On balance, the Court finds that the ALJ did not err in not finding PTSD and Panic Disorder as non-severe impairments during the Step Two analysis. First, the ALJ's conclusion that "the record does not adequately establish" PTSD or Panic Disorder is a reasonable one, because the ALJ found that in the record, details of any trauma suffered by Plaintiff were "sparse and inconsistent." (AR 21.) This inconsistent evidence includes an occasion where Plaintiff reported he "believe[d] there was some sexual abuse" in his past but at another evaluation with Dr. Kalich stated that "he had no memory of sexual abuse" as well as a report from Plaintiff that he was molested as a child and placed in a Boy's home in Houston for six years (from ages 8 to 14) but during another evaluation Plaintiff stated that he suspected "he may have been" sexually abused and that he spent six months in a treatment facility, instead of six years. (AR 21, 352, 407, 419.) Similarly, the ALJ also reasonably concluded that "the record does not establish a severe cognitive disorder" or Panic Disorder. (AR 21.) For example, Dr. Monis found that it was odd and contradictory for Dr. Weibe to diagnose Plaintiff with an amnestic mild cognitive impairment in July 2012 but one year later, report that Plaintiff obtained a Full Scale IQ score of 122, with a score of 108 for working memory, which was ten (10) standard deviations above the norm for

memory. (AR 21, 273, 332.) Dr. Monis also testified that those results could be indicative of malingering, or feigning disease, but did not have enough information to make that conclusion. (AR 451.) The ALJ further reasonably concluded that the existence of Panic Disorder was also inconsistent with the information that Plaintiff was able to provide at Dr. Kalich's evaluation, where Plaintiff recounted details of his life history, feelings and daily activities ("he is capable of tidying areas that are accessible to him" and "is able to prepare simple meals," "attend to personal hygiene," and "drive a vehicle" as well as participate in household chores, attend appointments and run errands outside of his home when necessary). (AR 407-13.)

Furthermore, even though the ALJ did not find PTSD or Panic Disorder sufficiently established by the record or as a severe impairment, any error in doing so is harmless because he "considered all mental health symptoms and findings as part of the claimant's affective, anxiety, and personality disorders" and discussed them later on in his analysis in Step Four. (AR 21.) "The Ninth Circuit has held that an ALJ's failure to consider a severe impairment at Step Two can amount to a harmless error when the ALJ subsequently discusses the limitations posed by that impairment at Step Four." *Clark v. Berryhill*, No. 17-cv-00371-JCS, 2018 WL 3659052, at *24 (N.D. Cal. Aug. 2, 2018) (citing *Lewis*, 498 F.3d at 910-11 (holding that the ALJ's failure to list plaintiff's bursitis at Step Two constituted harmless error because the ALJ's decision "reflect[ed] that the ALJ considered any limitations posed by the [plaintiff's] bursitis at Step 4")); *see also Bryant v. Colvin*, No. 15-cv-02982 (JSC), 2016 WL 3405442, at *25 (N.D. Cal. June 21, 2016) ("any error was harmless, as the ALJ considered Plaintiff's right-sided weakness in assessing Plaintiff's RFC."). Therefore, even if the ALJ erred in not finding PTSD or Panic Disorder as severe impairments of Plaintiff – and the Court finds that the ALJ did not err as such – such an error would be harmless because the ALJ later used mental health symptoms and findings (that included PTSD or Panic Disorder evaluations) in Step Four to determine the Plaintiff's RFC.

### C. Whether the ALJ Erred in Determining Plaintiff's RFC

Next, Plaintiff argues that the ALJ erred in determining his RFC. (Plf.'s Mot. at 20.) Essentially, Plaintiff argues that he would have been assigned a more restrictive RFC had the ALJ not failed to account for the difficulties that Plaintiff would have – according to one or more

examining psychologists – in maintaining regular attendance and punctuality, in remaining on-task, in completing a workday or workweek without interruptions from psychological symptoms, and in withstanding the stress of a routine workday. (*Id.*) In support of his argument, Plaintiff cites how VE, or Vocational Expert, Lynda Berkley testified that a hypothetical claimant would be unemployable if he missed more than one day of work a month, how Drs. Wiebe and Kalich each found marked impairment in Plaintiff's ability to maintain attendance while Dr. Schnurr stated he had a poor ability to maintain attendance, how VE Berkeley also testified that an employee who was off-task 20 percent of the workday would not be able to maintain employment and an employee who required one additional 15-minute break every day would not be employable, how the limitations found by any or all of the four examining psychologists would support a finding that Plaintiff would be off-task 20 percent of the time, how Drs. Wiebe and Kalich said Plaintiff would have marked impairment in maintaining a consistent pace without an unreasonable number of rest periods, how Dr. Schnurr found that Plaintiff would have difficulty completing a workday without interruptions, and how Dr. Sardy found moderate-to-severe impairment in Plaintiff's ability to withstand the stress of a routine workday. (*Id.* at 21.)

In response, Defendant asserts that the ALJ properly assessed Plaintiff's mental functional ability and RFC. (Def.'s Opp'n at 2.) Defendant further states that a claimant's RFC is the most a claimant can do despite his limitations, and is based on all the relevant evidence in the record. (*Id.*) Defendant additionally argues that in making the RFC determination, the ALJ takes into account those limitations for which there is record support that does not depend on properly rejected evidence and subjective complaints. (*Id.* at 2) (citing *Batson v. Comm'r*, 359. F.3d 1190, 1197 (9th Cir. 2004)). Defendant also points out that as the fact-finder, the ALJ weighed all the relevant evidence, including Plaintiff's treatment notes, examination records, medical opinions, and Plaintiff's testimony and statements, to find that Plaintiff could perform non-public simple repetitive tasks in positions where he required no more than occasional interaction with co-workers and incidental public contact, with that finding based on a reasonable interpretation of the overall record, including generally normal clinical findings and the opinions of Social Security disability experts, medical doctors, state agency psychologists, therapists and other professionals

that Plaintiff could perform work with limitations in public interaction. (*Id.* at 2-3.) In addition, as also discussed above, Defendant notes that the ALJ reasonably gave more weight to the consistently record-supported opinions of Drs. Lucila and Monis over the opinions of the other medical sources that were based on one-time examinations containing contradictory data and conflicting data and that were also not supported by the objective findings. (*Id.* at 3.)

In reply, Plaintiff merely reiterates its argument that because the ALJ erred in giving little to no weight to the opinions of any of the aforementioned four examining physicians, the ALJ also erred in determining Plaintiff's RFC. (Plf.'s Reply at 8.)

Upon consideration of the parties' arguments, the Court finds that the ALJ did not err in determining Plaintiff's RFC because the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti,* 533 F.3d at 1041-42. The ALJ acted as the proper fact-finder and final arbiter by analyzing all the relevant medical evidence, in a two-step process,[4] to conclude that even though Plaintiff's medically determinable impairments could reasonably be expected to cause some alleged symptoms, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (AR 23.) The ALJ backed up this reasoning by citing to medical opinions for both Plaintiff's physical impairments used to evaluate the physical component of the RFC (e.g., various opinions stating how many pounds Plaintiff could carry and lift, how much Plaintiff could stand and/or walk in an 8-hour workday, Plaintiff's range of motion, imaging studies of Plaintiff's back, and so on) and Plaintiff's mental impairments used to evaluate the mental component of the RFC (e.g., various psychological tests such as MCMI-III, MMSE, BDI-II, mental health questionnaires, GAF scores).

_____

[4] "In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms. Second, once an underlying or mental impairment(s) that could reasonably be expected to product the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record." (AR 23.)

(AR 23-28.) The ALJ also cites contradictory evidence for Plaintiff's physical impairments (e.g., minor complaints of back pain, shortness of breath, etc.) such as Plaintiff stating he worked out at a gym two to three times a week, and Plaintiff's mental impairments (e.g., consistent mild to moderate impairment with attention, concentration and persistence) such as the Plaintiff appearing "flustered" when not able to obtain completed disability paperwork from Dr. Kayman (suggesting that his motive was not treatment but to obtain social security claim documentation), and how he spent time with friends, attended movies, played games, attended local events two to three times per month, walked a lot, went to a Halloween party and took a trip to Disneyland, all "activities not consistent with debilitating social phobia." (AR 23-28.) Thus, the ALJ's determination of Plaintiff's RFC is not only rational, justified and well-reasoned, but also supported by substantial evidence based upon a detailed review of the entire medical evidence record.

### D.   Whether the ALJ Erred in Evaluating Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in evaluating Plaintiff's credibility. (Plf.'s Mot. at 21.) Specifically, Plaintiff alleges that because there is no affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony about the severity of symptoms must be "clear and convincing" and because Plaintiff produced medical evidence of an underlying impairment, the Commissioner may not discredit the Plaintiff's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. (*Id.*) Plaintiff has issues with the ALJ's determinations that Plaintiff's cane use and his social activities were not credible. (*Id.* at 22-23.) Specifically, Plaintiff argues that his cane use is supported by multiple complaints of back pain, or chronic pain and weakness. (*Id.* at 22.) For his social activity, Plaintiff cites a case stating that the "Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen,* 885 F.2d 507, 603 (9th Cir. 1989). Plaintiff further contends that going to one party and taking one trip during the three-year period prior to his hearing is not inconsistent with a debilitating social phobia, and that the ALJ's interpretation of Dr. Kayman's remarks about Plaintiff being "flustered" suggests Plaintiff's motive for that visit was not treatment, but was to obtain documentation for his claim "second-guesses" the doctor's opinion. (*Id.* at 22-23.)

In response, Defendant asserts that Congress expressly prohibits granting disability benefits based on a claimant's subjective complaints. (Def.'s Opp'n at 10.) Defendant further argues that an ALJ is required to make specific credibility findings, and such a credibility finding must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective testimony. (*Id.* at 11) Defendant additionally maintains that in this case, the ALJ considered Plaintiff's allegations of disabling physical and mental limitations and then provided valid reasons for finding that Plaintiff's allegations were not fully credible. (*Id.* at 11) (citing *Tommasetti*, 533 F.3d at 1039 ("If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'")). Defendant avers that first, the ALJ reasonably found that the medical evidence failed to support Plaintiff's subjective complaints. (*Id.*)

Defendant confirms the ALJ's explanation that the physical examinations in the record did not support Plaintiff's allegations that he could only walk 30 minutes or that he required a cane two to three times per year due to sciatic pain, reasoning that the treatment record concerning physical conditions was "sparse and primarily reflects routine care." (*Id.* at 11-12.) Defendant then points out that Plaintiff does not challenge this finding but refers to more than one complaint of back pain in the record. (*Id.* at 12.) Defendant argues that even if Plaintiff complained of back pain more than one time, that does not undermine the ALJ's finding that Plaintiff's sparse treatment records and routine care undermined his complaints of disabling limitations. (*Id.*)

Defendant also confirms the ALJ's finding that the mental status evidence did not support Plaintiff's complaints of disabling mental limitations. (*Id.*) Defendant states that Dr. Kayman remarked that Plaintiff wanted disability paperwork completed at the first visit and was "flustered" to find out that was not possible, as the ALJ pointed out. (*Id.*) Defendant then argues that the ALJ reasonably inferred that Plaintiff's motive was to obtain documentation for his claim not to receive treatment. (*Id.*) Defendant also asserts that the ALJ reasonably found that Plaintiff's subjective complaints were not supported by his activities, for example, despite Plaintiff's allegations that he had social phobia and avoided going out, he spent time with friends attending movies and local events, playing games, and went to a Halloween party as well as Disneyland. (*Id.* at 12-13.)

1      In reply, Plaintiff argues that in suggesting Plaintiff sought a visit from Dr. Kayman to

2   obtain claim documentation and not to receive treatment because he was "flustered" when told that

3   that was not possible, the ALJ "impermissibly" second-guessed the doctor's opinion. (Plf.'s Reply at 8.)

4      On balance, the Court finds that the ALJ did not err in evaluating Plaintiff's credibility. In

5   assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of

6   symptoms, the ALJ must engage in a two-step inquiry. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th

7   Cir. 2009). An ALJ must first determine "whether the claimant has presented objective medical

8   evidence of an underlying impairment which could reasonably be expected to produce the pain or

9   other symptoms." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotations

10  and citations omitted). At this step, a claimant need not show that her impairment "could

11  reasonably be expected to cause the severity of the symptom she has alleged; she need only show

12  that it could reasonably have caused some degree of the symptom." *Id.* Next, if a claimant meets

13  this first prong and there is no evidence of malingering, the ALJ must then provide "specific, clear

14  and convincing reasons" for rejecting a claimant's testimony about the severity of his or her

15  symptoms. *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).

16     In evaluating the claimant's testimony, the ALJ may use "ordinary techniques of credibility

17  evaluation." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010) (quoting

18  *Smolen*, 80 F.3d at 1284). For example, the ALJ may consider inconsistencies either in the

19  claimant's testimony or between the testimony and the claimant's conduct, "unexplained or

20  inadequately explained failure to seek treatment or to follow a prescribed course of treatment,"

21  *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80 F.3d at 1284); and "whether the claimant

22  engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter*, 504 F.3d at

23  1040. Even though a claimant need not "vegetate in a dark room" in order to be eligible for Social

24  Security Income benefits, certain activities or behavior may support a finding of no disability. *See*

25  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971

26  (3d Cir.1981)). For instance, the ALJ may discredit a claimant's testimony when the claimant

27  reports participation in everyday activities indicating capacities that are transferable to a work

28  setting. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Fair*, 885

F.2d at 603. Even when those activities suggest some difficulty functioning, they may still be used as grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225; *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

Here, the ALJ properly evaluated the Plaintiff's credibility under the aforementioned two-step analysis. As to the first prong, the ALJ found that Plaintiff's underlying impairments could reasonably be expected to cause the alleged symptoms. (AR 23.) Furthermore, the ALJ also legitimately found that Plaintiff's statements considering the intensity, persistence and limiting effects of those symptoms were not entirely credible. (*Id.*) As to the second prong, the ALJ provided specific, clear and convincing reasons for rejecting Plaintiff's testimony of his symptoms by using ordinary techniques of credibility evaluation. For example, the ALJ pointed to many activities that Plaintiff engaged in that appeared inconsistent with both of Plaintiff's physical and mental symptoms such as working out at a gym multiple or several times a week while also stating he had to use a cane on rare occasions and that he had sciatic pain and back pain, recently moving in with his boyfriend, working on a book, going online, spending time with friends, attending movies, playing games or attending local events two to three times per month, walking a lot, going to a Halloween party and taking a trip to Disneyland. (AR 23-28.); *see also Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (the ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms" and the "ALJ could reasonably conclude that Molina's activities, including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering from debilitating panic attacks").

Also, contrary to Plaintiff's arguments, the ALJ's analysis is not "second-guessing" any medical opinion because it is the ALJ's job to make determinations and findings based on the facts and evidence in the record. Moreover, many of the social and physical activities that the ALJ observed are arguably transferable to a work setting such as working out, walking, writing a book, going online and socializing. And even when those aforementioned activities suggest some difficulty in full social or psychological functioning, they can still be validly used by the ALJ to

36

discredit Plaintiff's testimony to the extent that it contradicts claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225; *Valentine,* 574 F.3d at 693. Finally, the ALJ's suggestion that Plaintiff's motive for visiting Dr. Kayman was not for treatment but for obtaining claim documentation (due to acting "flustered" when he found out that filling out his disability paperwork was not possible during the first visit) was rational, well-reasoned and justified because such behavior would appear to any fact-finder as being suspicious, and it is up to the ALJ, not medical examiners, to make these fact-based credibility determinations from the record.

### E. Whether the Appeals Council Erred in Rejecting Material Evidence

Next, Plaintiff argues that the Appeals Council erred in rejecting material evidence. (Plf.'s Mot. at 23.) Specifically, Plaintiff alleges it was error for the Appeals Council to reject its submitted additional records for the reason that the "additional evidence does not relate to the period at issue" and as a result, "did not make it part of the record." (*Id*.) Plaintiff also avers that Defendant submitted an incomplete copy of the Administrative Transcript, and the Court should consider all of the evidence Plaintiff submitted as part of the administrative record because it was submitted to the Appeals Council. (*Id*.) Furthermore, Plaintiff also attached the previously denied additional records as exhibits to its motion for summary judgment, which show that Plaintiff continued to seek treatment for his symptoms of his longstanding psychological impairments, including PTSD, which the ALJ had considered non-severe. (*Id.*)

In response, Defendant states that Plaintiff's argument that the Appeals Council erred in rejecting evidence dated after the ALJ's decision is meritless. (Def.'s Opp'n at 13.) Defendant points out that as an initial matter, federal courts "do not have jurisdiction to review a decision of the Appeals Council denying a request for review of an ALJ's decision, because the Appeals Council decision is a non-final agency action." (*Id.*) (citing *Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012); *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011) (when the Appeals Council declines review, "the ALJ's decision becomes the final decision of the Commissioner" subject to substantial evidence review based on the record as a whole). Defendant also maintains that the Appeals Council properly found that the additional records submitted from Plaintiff, dated between March 2016 and May 2017, did not affect the

ALJ's decision about whether Plaintiff was disabled on or before February 19, 2016, because the relevant regulations in 2011, which were in effect at the time of the ALJ's decision, state that:

> The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision. **If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision,** the Appeals Council will return the additional evidence to you with an explanation as to **why it did not accept the additional evidence** and will advise you of your right to file a new application.

20 C.F.R. § 416.1476(b)(1) (2011) (emphasis added).

Defendant further argues that the Appeals Council's decision to reject this evidence because it post-dated the ALJ's decision is consistent with case law. (Def.'s Opp'n at 14) (citing *Quesada v. Colvin*, 525 Fed. Appx. 627, 630 (9th Cir. 2013) (unpublished) (district court properly concluded that additional evidence claimant submitted to the Appeals Council would not have changed the outcome because it post-dated the ALJ's decision and, therefore, was irrelevant); *Brewes*, 682 F.3d at 1162. Finally, Defendant asserts that even if the Court finds that the Appeals Council should have found these additional medical records pertaining to the relevant disability period, they still do not disturb the validity of the ALJ's decision. (Def.'s Opp'n at 14.) For example, Defendant argues that the additional medical records do not undermine the ALJ's reasonable finding that Plaintiff could perform non-public simple repetitive tasks in positions where he required no more than occasional interaction with co-workers. (AR 22-23.) The additional medical records merely show that upon testing, Plaintiff's general intellectual functioning fell in the "superior range," his verbal abilities were also in the "superior range," his processing speed and ability to hold information and manipulate it to solve problems was in the "average range," and his visuospatial perceptual and reasoning skills were in the "very superior" range. (Def.'s Opp'n at 14-15.) Moreover, the additional medical records show attention or concentration tests where Plaintiff exhibited "average" to "high average" results. (*Id.* at 15.) Finally, similar to the evidence already considered by the ALJ, the additional medical records reflect Plaintiff's participations in a wide range of activities, e.g., Plaintiff indicating that he could manage the activities of daily living independently, and Plaintiff also engaging in hobbies such as

walking, social media, cigars with friends, reading, writing stories, and blogging. (*Id.*) Thus, Defendant concludes that Plaintiff's new evidence does not change the substantial evidence supporting the ALJ's decision and even though Plaintiff attached those numerous records to his brief, he failed to explain how any of those records would undermine the ALJ's decision. (*Id.*)

In reply, Plaintiff contends that the evidence submitted to the Appeals Council relates to the period at issue because it supports the opinions of the examining physicians, which were rejected by the ALJ: hence, Plaintiff argues, the additional records should have been considered. (Plf.'s Reply at 8.) Plaintiff also points out the additional records include opinions from Dr. Peter van Oot and a treating provider at Axis Health diagnosing him with PTSD, with Dr. van Oot opining that although Plaintiff had average or above-average intellectual functioning in some areas, he had extreme memory impairments in other areas. (*Id.*) Plaintiff additionally argues that in only sending a Notice of Action and Order of Appeals Council back to Plaintiff, the Appeals Council did not comply with SSA regulations by failing to return the new evidence to the Plaintiff.

Upon consideration of both parties' arguments and the relevant law, the Court finds that the Appeals Council did not err in rejecting material evidence, or the new additional records submitted by Plaintiff. Plaintiff's submission simply fails to comport with the requirements of 20 C.F.R. § 416.1476(b)(1) (promulgated in 2011, and in effect at the time of the ALJ's decision on January 20, 2016 before being changed on December 16, 2016) by being "evidence which does not relate to the period on or before the date of the administrative law judge hearing decision" or January 20, 2016, as the documents are dated August 10, 2016 (Ex. A, Dkt. No. 17-1), March 20, 2016 to August 15, 2016 (Ex. B, Dkt. No. 17-2) and October 11, 2016 to May 26, 2017 (Ex. C, Dkt. No. 17-3), all times or time periods clearly after January 20, 2016. Moreover, even if these additional records were admitted by the Appeals Council, the ALJ's decision would be undisturbed, as the additional records seem to support, and not undermine, the analysis and conclusions reached by the ALJ in his decision. Also, although these additional records were considered by the Court, it must be reiterated that they are not part of the record due to the decision from the Appeals Council in rejecting them. Accordingly, the Court finds that the Appeals Council did not err in rejecting the additional records submitted by Plaintiff.

### F. Remanding for Payment of Benefits or Further Proceedings

Plaintiff finally argues that the Court should remand for payment of benefits, or in the alternative, for further proceedings. (Plf.'s Mot. at 24.) (citing *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) ("Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.")). Plaintiff asserts that the Court may remand to an ALJ with instructions to calculate and award benefits if: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, 758 F.3d at 1020. Plaintiff then contends that once the three prongs of this "credit-as-true" rule are met, the claimant is entitled to an award of benefits unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled," in which case remand for further proceedings would be appropriate. *Id.* at 1020-21. Thus, Plaintiff argues that this case satisfies the "credit-as-true" rule because the record has been fully developed and further administrative proceedings would serve no useful purpose, the ALJ improperly rejected the opinions of the four examining physicians Drs. Sardy, Schnurr, Wiebe and Kalich, and the four examining opinions, either alone or combined, would necessarily lead to a finding of disability at either Step Three or Five. (Plf.'s Mot. at 24.)

In response, Defendant argues that the Court should instead affirm the Commissioner's final decision because the ALJ's findings are supported by substantial evidence and free from reversible legal error. (Def.'s Opp'n at 15.) In the event the Court overturns the ALJ's decision, however, Defendant asserts that the proper remedy would be remand for further administrative proceedings. Defendant further contends that the Ninth Circuit has clarified that the credit-as-true rule only justifies an award of benefits in narrow circumstances. (*Id.*) (citing *Treichler* v. Comm'r, 775 F.3d 1090, 1099-1102 (9th Cir. 2014) ("Administrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence may well prove enlightening in light of the passage of time.") (citations omitted)).

In reply, Plaintiff attempts to distinguish the *Treichler* case cited by Defendant by arguing that this case contains no outstanding issues. (Plf.'s Reply at 9.) Moreover, Plaintiff asserts that in this case, if the improperly discredited evidence (any or all of the four examining psychologists' reports) is credited as true, there would be no outstanding issues to be resolved, and an award for payment of benefits would be warranted. (*Id.*)

Upon consideration of the parties' arguments, the Court sees no reason to remand for payment of benefits or for further proceedings. Because the ALJ's decision is supported by substantial evidence and well-reasoned analysis, it is also free from reversible legal error. As a result, the credit-as-true rule or the *Treichler* holding suggesting a remand for further proceedings are inapplicable here. Accordingly, the ALJ's decision is affirmed.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED, and Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court shall close this case.

IT IS SO ORDERED.

Dated: September 28, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge